OWENS v ALLIS-CHALMERS CORPORATION

Docket No. 61965. Argued June 3, 1980 (Calendar No. 8).—Decided
November 23, 1982.

Sallie Mae Owens, as administratrix of the estate of her husband,
Dan Owens, Jr., deceased, brought a products liability action
against the Allis-Chalmers corporation, alleging negligent or
defective design of a forklift manufactured by the defendant in
which her husband was killed. The grounds alleged were that a
defect in the vehicle caused the accident, that the stability of
the vehicle had not been tested properly, and that the defen-
dant failed to provide a driver restraint in the forklift as
standard equipment. The plaintiff offered expert testimony in
support of her allegations. The Wayne Circuit Court, Horace W.
Gilmore, J., granted the defendant's motion for a directed
verdict on the ground that no basis for the expert's opinion was
presented and that more than the expert's unsubstantiated
opinion was necessary to allow the case to go to the jury. The
Court of Appeals, Bashara, P.J., and J. H. Gillis, J. (N. J.
Kaufman, J., concurring), affirmed (Docket No. 31521). The
plaintiff appeals, alleging that she had established a prima
facie case that the forklift was defectively designed because of
failure to provide a driver restraint as standard equipment.

In a unanimous opinion by Justice Coleman, the Supreme
Court held:

The plaintiff did not present a prima facie case that the
design of the forklift presented an unreasonable risk of foresee-
able injuries at the time of the design or manufacture of the
vehicle under theories of negligence or defective product, and
granting the defendant's motion for a directed verdict was
proper.

1. Compliance by manufacturers of products with governmen-
tal and industrial standards is admissible as evidence but is not
conclusive as to whether the defendant was negligent or the
product was defective.

2. Whether a product is unreasonably dangerous does not

REFERENCES FOR POINTS IN HEADNOTES
[1] 63 Am Jur 2d, Products Liability §§ 25, 26, 28, 29.
[2] 63 Am Jur 2d, Products Liability § 9 et seq.

depend on whether the dangers are latent or patent. The obviousness of the risks which inhere in some simple tools or products is a factor in concluding that the product is not unreasonably dangerous. The test, however, is not whether the risks are obvious, but whether the risks were unreasonable in light of the foreseeable injuries.

3. The plaintiff failed to offer evidence concerning the magnitude of the risks involved in using the forklift and the reasonableness of her proposed alternate designs. Although on the basis of her expert's testimony an inference might be drawn that injuries such as those received by her husband were foreseeable, neither the expert testimony nor other evidence indicated the likelihood of a driver suffering such injuries; nor was there an indication how the use of any of the driver restraints would affect the driver's safety in other situations or his ability to do his job. Viewing the evidence in a light most favorable to the plaintiff, it cannot be concluded that a prima facie case of the defendant's negligence or of a defective product was established.

Affirmed.

83 Mich App 74; 268 NW2d 291 (1978) affirmed.

1. PRODUCTS LIABILITY — NEGLIGENCE — STANDARD OF CARE.

Compliance by a manufacturer with governmental and industrial standards in the manufacture of a product is admissible as evidence but compliance is not conclusive as to whether the defendant was negligent or the product was defective (MCL 600.2946; MSA 27A.2946).

2. PRODUCTS LIABILITY — NEGLIGENCE — STANDARD OF CARE.

The test in determining whether a product is unreasonably dangerous is not whether the risks are obvious, but whether the risks are unreasonable in the light of foreseeable risk of injury.

*Goodman, Eden, Millender & Bedrosian* (by *Robert A. Koory)* and *Hurwitz & Karp* (by *Miles A. Hurwitz)* for plaintiff.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *Daniel L. Garan),* and *Gromek, Bendure & Thomas* (by *Mark R. Bendure)* for defendant.

Amici Curiae:

*Clark, Klein & Beaumont* (by *Dwight H. Vincent, John F. Burns,* and *James E. Baiers)* for Michigan Manufacturers Association.

*Faintuck, Shwedel, Wolfram, McDonald & Zipser* (by *William G. Wolfram)* for Michigan Defense Trial Counsel, Inc., and The Association of Defense Trial Counsel.

*Schaden & Heldman* (by *Richard F. Schaden* and *Victoria C. Heldman)* for Michigan Trial Lawyers Association.

*Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, P.C.* (by *Jeannette A. Paskin),* and *William H. Crabtree,* Vice President and General Counsel, and *Edward P. Good,* Senior Attorney, Motor Vehicle Manufacturers Association of the United States, Inc., for Motor Vehicle Manufacturers Association of the United States, Inc.

COLEMAN, J. In this products liability case, plaintiff appeals from a directed verdict granted in the circuit court and affirmed in the Court of Appeals. She argues that the testimony of her expert witness created a question of fact for the jury. We disagree, and affirm the decision of the trial court, but for reasons different from those of the Court of Appeals.

## I

Leave to appeal was granted in order to consider the following questions:

1. Does a manufacturer's compliance with industry or governmental standards in a products liabil-

ity action preclude the jury from determining whether such conduct was reasonable?

2. Is the test for assessing a manufacturer's liability to persons injured by its product whether the risk is unreasonable and foreseeable by the manufacturer, and not whether the risk is patent or obvious?

After the briefs were filed and oral arguments were heard, the Court requested the parties to file supplemental briefs addressing the following added issues:

3. Did the trial court err, in light of MRE 705, in holding that the testimony of plaintiff's expert witness did not create a question of fact for the jury?

4. Does a manufacturer of a vehicle have a duty to design and manufacture its products so as to eliminate any unreasonable risk of foreseeable injury to the occupants as a result of a collision for which the manufacturer may not be responsible?

II

Plaintiff's husband had been a qualified forklift driver at Great Lakes Steel for four or five years prior to September 30, 1970. He reported to work shortly after midnight on that date and was assigned to the location where he would be working for the evening. A short time later, other employees found that he had been in an accident en route to his assignment. No one witnessed the accident. For undetermined reasons, the forklift which he was operating had traveled off the roadway, struck a concrete-filled post, and turned over on its side. There were no skidmarks, and the post was

knocked over to a 33-degree angle. Plaintiff's husband was pinned under the overhead protective guard on the forklift and was dead when discovered. After the accident, the forklift was tested and found to be in perfect mechanical order. The road was one regularly traveled by forklift drivers. There had been no complaints about the road condition, nor had there been any prior accident.

The physician called to the scene found that the decedent had suffered a fractured skull, which seemed to the doctor to be the most plausible cause of death. However, it could not be determined at the scene whether a heart attack or other physical failure preceded the accident. An autopsy was ordered but was not offered into evidence prior to the conclusion of plaintiff's proofs and the directed verdict of the trial court. Plaintiff's motion *in limine* to suppress the autopsy report of 0.32% alcohol in the decedent's urine was denied by the trial judge.

Plaintiff sued the manufacturer of the forklift, Allis-Chalmers Corporation, utilizing theories of negligence, implied warranty, and strict liability. At trial she sought, *inter alia,* to prove that defendant's negligence or some defect in the vehicle had caused the accident and that the stability of the forklift had not been properly tested. She also sought to prove that the design of the forklift was defective for failing to provide some sort of factory-installed driver restraint that would have prevented the decedent's ejection during the rollover and, hence, would have prevented his being pinned under the overhead guard.

However, on appeal, plaintiff does not challenge that portion of the trial court's directed verdict

which found no evidence that either the forklift's collision with the post or the rollover was caused by a defect in the forklift or the manufacturer's negligence. She did appeal the denial of her motion *in limine* to the Court of Appeals, but does not pursue that issue in her appeal to this Court.

The issue she presents to us is whether she established a prima facie case that the forklift was defectively designed because of its failure to include some sort of driver restraint as standard equipment.

In seeking to prove defective or negligent design, the plaintiff relied on the testimony of one expert witness, Joseph Harris. Mr. Harris was employed as an independent consulting physicist, and previously had worked for General Motors for 12 years in the area of vehicle safety. He had never designed a forklift, nor any part of one, and had not worked in conjunction with their manufacture. He had operated one during a summer about 30 years prior to trial, but not since. Apart from preparing for this litigation, the record is not clear concerning whether any of his work in the area of vehicle safety had related specifically to forklifts. He testified, however, that a forklift was just another type of vehicle to which much of his work on vehicles in general would be applicable.

Plaintiff's expert gave his opinion that a rollover was a foreseeable type of forklift accident. He also stated that it was foreseeable that a forklift driver could be pinned under the overhead protective guard in the event of a rollover. The overhead protective guard, which consisted of four posts and an overhead screen, is a safety device used on forklifts in order to prevent objects from falling on

the driver's head. Mr. Harris recognized the guard
as being a proper safety device, but testified that
when it is used some sort of driver restraint
should be utilized to keep the driver from being
ejected through the open sides of the forklift in the
event of a rollover.

He suggested four types of driver restraints that
might have been effective: first, a seat belt; second,
a cage-type enclosure; third, a bar like those used
on carnival rides; and fourth, an encapsulating
seat which would have arms that to some extent
would restrict a driver's movement. He gave his
opinion that had a driver restraint been used the
decedent might still have been injured, but he
might not have been crushed.

The cage-type enclosure which he suggested was
offered by the defendant and other forklift manu-
facturers as an option. It had been offered to
plaintiff's employer, but was not purchased.

Plaintiff's expert testified that he was not aware
of any law, safety regulation, standard, or policy
that required or suggested the use of driver re-
straints on forklifts. He also did not know of any
manufacturer which provided seat belts or any
driver restraints as standard equipment.[1] He had
not seen driver restraints on the kind of forklift
involved in this accident.

Evidence was admitted that union employees at
decedent's workplace indicated after decedent's
death that they would not wear seat belts if they
were provided because they considered it more

---

[1] Apart from the cage-enclosure option, the only time he had seen a
forklift equipped with any of the proposed restraints was when he
had worked at General Motors and had noticed that two huge
forklifts that were used to transport cars had seat belts.

dangerous to be trapped in a forklift during a rollover. They would not be able to jump free. Many kinds of "protective" devices were tested and found to be more dangerous than the model used.

At the close of plaintiff's proofs, the defendant moved for a directed verdict, arguing, *inter alia,* that the record lacked any basis for the expert witness's assertion that driver restraints were needed, and that something more than the witness's mere unsubstantiated assertion was necessary to send this case to the jury. The plaintiff argued that on the basis of the expert's testimony, the question whether the design was defective should go to the jury on a strict-liability theory.

Circuit Judge Horace W. Gilmore determined that neither a negligent-design theory nor a strict-liability theory was supported by the record. He assumed that the rule of *Rutherford v Chrysler Motors Corp,* 60 Mich App 392; 231 NW2d 413 (1975), and *Larsen v General Motors Corp,* 391 F2d 495 (CA 8, 1968), would apply to the forklift industry and stated:

"[These cases do] not mean that the industry has to design a totally crashproof, injuryproof forklift. [They mean] that the manufacturer has a duty to design and manufacture so as to eliminate any unreasonable risk of foreseeable injury to its occupants as a result of a collision. *Now I find* nothing in this record other than again the bold assertions of Mr. Harris without supporting data of any standard whatever or any showing that you could say there is an unreasonable risk of foreseeable injury of this kind because of the design of this vehicle. It just is not on this record." (Emphasis added.)

The plaintiff appealed the directed verdict to the

Court of Appeals. The Court of Appeals affirmed, but on grounds different from those utilized by the trial judge. *Owens v Allis-Chalmers Corp,* 83 Mich App 74, 81; 268 NW2d 291 (1978). The majority concluded that

"for a plaintiff to establish a question of fact as to a manufacturer's breach of duty in design defect products liability litigation, evidence of the following must be presented:

"(1) That the particular design was not in conformity with industry design standards, design guidelines established by an authoritative voluntary association, *or* design criteria set by legislative or other governmental regulation; *or*

"(2) That the design choice of the manufacturer carries with it a *latent* risk of injury *and* the manufacturer has *not* adequately communicated the nature of that risk to potential users of the product."

Judge N. J. KAUFMAN wrote a concurring opinion in which he concluded that "a careful reading of the transcript reveals that there was no testimony whatsoever that the injury was caused by any defective product". *Id.,* 83.

## III

The first two questions asked of the parties upon granting leave to appeal were those framed by plaintiff and were related to the Court of Appeals opinion. The parties were directed to address first, the significance in a products liability case of a manufacturer's compliance with governmental and industrial standards, and second, whether the test for a manufacturer's liability depends upon whether the risks are unreasonable and foreseeable, regardless of whether they are patent and obvious. We will first address these questions as

they relate to products liability actions in general and then consider whether the Court of Appeals rationale supports a departure in design defect cases from the general rules.

A

This Court has previously held that compliance with governmental and industrial standards does not preclude a trier of fact from finding certain conduct to be negligent. The holding in *Marietta v Cliffs Ridge, Inc,* 385 Mich 364, 369-370; 189 NW2d 208 (1971), cited with approval in *Hill v Husky Briquetting, Inc,* 393 Mich 136; 223 NW2d 290 (1974), remains as precedent. Also see *Webster v Symes,* 109 Mich 1; 66 NW 580 (1896).

As stated in *Marietta,* 369-370:

"The customary usage and practice of the industry is relevant evidence to be used in determining whether or not [the] standard [of reasonable care] has been met. Such usage cannot, however, be determinative of the standard."

Judge Learned Hand eloquently stated the rule when he wrote:

"Indeed, in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages." *The TJ Hooper,* 60 F2d 737, 740 (CA 2, 1932).

We note that our Legislature has recently enacted a statute which provides that industrial and governmental standards are admissible in products liability actions, MCL 600.2946; MSA 27A.2946.

The statute does not provide that such standards are conclusive. The defendant, in arguing that plaintiff did not present a prima facie case, does not challenge the rule that compliance with governmental and industrial standards is admissible as evidence but is not conclusive as to whether the defendant was negligent or the product was defective. We reaffirm that position.

## B

Apart from those instances in which the design of a product does not conform with governmental or industrial standards, the only other design defect cases in which liability would attach under the Court of Appeals holding would be those cases in which "the design choice of the manufacturer carries with it a *latent* risk of injury *and* the manufacturer has *not* adequately communicated the nature of that risk to potential users of the product". 83 Mich App 81. The limitations adopted by the Court of Appeals would preclude liability in any case in which the risk is patent and obvious, unless there was non-compliance with industrial or governmental standards. Defendant, however, does not argue in favor of the Court of Appeals holding insofar as it would exclude liability for all patent and obvious dangers where there was compliance with industrial standards, but instead argues for the more limited proposition that when the dangers are patent and obvious, there is no duty to warn. We note, however, that the language in one of our prior products liability actions would tend to support the proposition that liability does not attach when the dangers are patent and obvious.

In *Fisher v Johnson Milk Co, Inc,* 383 Mich 158; 174 NW2d 752 (1970), the defendant sold plaintiff a wire carrier for milk bottles. When he was

carrying milk bottles in the wire carrier, he slipped on some ice. The bottom of the carrier struck the sidewalk and the bottles broke. In extending his hand to break his fall, the plaintiff cut it on glass from the broken bottles. He sued the defendant claiming, *inter alia,* that defendant was negligent in not placing a false bottom on the milk carrier and that defendant had breached its implied warranty of merchantability by selling an unsafe product. The trial court granted summary judgment and this Court affirmed:

"There was no inherent, hidden or concealed defect in the wire carrier. Its manner of construction, how the bottles would rest in it, and what might happen if it were dropped, upright, on a hard surface below, with the possibility that the contained bottles might break, was plain enough to be seen by anyone including a patent attorney [the plaintiff] as well as a milk dealer. There is no duty to warn or protect against dangers obvious to all." *Fisher,* 160.

However, it should be noted that *Fisher* relied in part on *Campo v Scofield,* 301 NY 468, 472; 95 NE2d 802 (1950), in which it was stated:

"If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands. * * * In other words, the manufacturer is under no duty to render a machine or other article 'more' safe as long as the danger to be avoided is obvious and patent to all."

*Campo* was overruled in *Micallef v Miehle Co,* 39 NY2d 376, 384; 384 NYS2d 115; 348 NE2d 571 (1976). The New York Court of Appeals in *Micallef* quoted Professors Harper and James:

" '[T]he bottom does not logically drop out of a negligence case against the maker when it is shown that the purchaser knew of the dangerous condition. Thus, if the product is a carrot-topping machine with exposed moving parts, or an electric clothes wringer dangerous to the limbs of the operator, and if it would be feasible for the maker of the product to install a guard or a safety release, it should be a question for the jury whether reasonable care demanded such a precaution, though its absence is obvious. Surely reasonable men might find here a great danger, even to one who knew the condition; and since it was so readily avoidable they might find the maker negligent.' (2 Harper & James, Torts, § 28.5.)"

The Court agreed and abandoned the requirement that a latent defect must be proved in order to support liability.

Our Court of Appeals has essentially limited the language in our decision in *Fisher* by the fact that *Fisher* involved a simple product or tool. *Coger v Mackinaw Products Co,* 48 Mich App 113; 210 NW2d 124 (1973); *Byrnes v Economic Machinery Co,* 41 Mich App 192; 200 NW2d 104 (1972); see, also, *Jennings v Tamaker Corp,* 42 Mich App 310; 201 NW2d 654 (1972). We believe that such a limitation is proper. Obvious risks may be unreasonable risks, and there is no justification for departing from general negligence and breach of implied warranty principles merely because the dangers are patent.

This is not to say that the obviousness of the danger is irrelevant. As in *Fisher,* the obviousness of the risks that inhere in some simple tools or products is a factor contributing to the conclusion that such products are not unreasonably dangerous. The test, however, is not whether the risks are obvious, but whether the risks were unreasonable in light of the foreseeable injuries.

## IV

The holding of the Court of Appeals was not based on a disagreement with the justice of the rules addressed in the previous section, but rather on the view that the unique nature of product design allows for competent review in the courts only in limited circumstances. Relying on the work of one commentator,[2] the Court of Appeals stated that the difficulty in such cases is that a design choice is "multi-faceted" or "polycentric". This designation highlights the fact that the design of a product is the result of many interrelated considerations, of which safety is but one. Any determination of the reasonableness of the design of a product is essentially an inquiry as to whether safety under a variety of conditions was given sufficient consideration.

The majority of the Court of Appeals, apparently in agreement with the commentator, concluded that the nature of adjudication is not such as to be amenable to competent evaluation of the reasonableness of such design decisions. The problem arises, the commentator argued, because the adjudicatory process needs a focus to its inquiry, whereas the review of a design decision at times can be essentially unfocused. An unfocused inquiry would result, for example, when one part of a product is alleged to be unsafe, but in order to render that part more safe in one respect the product would need to be redesigned. The redesigning of the product could perhaps be accomplished in various ways, but each new design might

---

[2] Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication,* 73 Colum L Rev 1531 (1973); Henderson, *Design Defect Litigation Revisited,* 61 Cornell L Rev 541 (1976).

change the characteristics of the product or cause it to be more dangerous in another respect. For each allegedly preferable design, the effect of the design change, given its feasibility, on the product would have to be considered in light of the ramifications of the utility, marketability, and general safety of the product. The necessary consideration of all these interrelated factors could lead the trier of fact, while seeking to determine whether the possible alternative designs prove the chosen design to have been unreasonably dangerous, into a web from which no principled decision would be possible. In order to provide the necessary focus in design defect cases, the Court of Appeals limited liability to instances in which the manufacturer had not complied with governmental or industrial standards or had failed to warn of a latent defect.

However, this case provides a noteworthy illustration of why the asserted problem does not justify the solution adopted in the Court of Appeals. Although this is not a "duty to warn" case,[3] nor a case in which there has been a departure from governmental or industrial standards, it does present a focused question.

The factual inquiry demanded is whether a forklift is unreasonably dangerous when it fails to include a factory-installed driver restraint, such as a seat belt. Obviously, to attach a seat belt to a forklift would not require major changes in the design, utility,[4] or costs of a forklift. When consid-

---

[3] Plaintiff did initially allege a failure to properly warn, but does not argue on appeal that the claim created a jury question.

[4] Here we are not concerned with the utility of the *use* of a seat belt, although that is an important question in Part V, but rather with the effect of installing a seat belt on the product. Even if seat belts are impractical for forklift drivers, a forklift with unused seat belts has the same utility as a forklift without seat belts.

ering whether it was unreasonable not to attach a
seat belt to a forklift as standard equipment, one
is not confronted with the open-ended question
whether another product, somewhat alike and
somewhat different from the product under scru-
tiny, should instead have been manufactured.

Additionally, because one form of driver re-
straint *was available* as an option, *i.e.,* the cage
enclosure, there was the manageable question
whether this available restraint should have been
installed as standard equipment. Although we find
that the plaintiff has not made a prima facie
showing, as will be discussed below, our affirmance
of the directed verdict is not based on the premise
that the issue presented was too open-ended to be
competently adjudicated.

V

Because we have determined that the Court of
Appeals decision does not provide appropriate
standards upon which to affirm the directed ver-
dict, we must now proceed to consider whether the
directed verdict was nevertheless proper. We ini-
tially granted leave to appeal limited to the two
questions related to the holding of the Court of
Appeals, but after oral arguments we requested
the parties to file supplemental briefs which would
include consideration of two additional questions.

These questions were issue (3), whether the testi-
mony of plaintiff's expert witness created a ques-
tion for the jury in light of MRE 705, and issue (4),
whether the manufacturer of a vehicle has "a duty
to design and manufacture his products so as to
eliminate any reasonable risk of foreseeable injury

to the occupants as a result of a collision for which the manufacturer may not be responsible".

We conclude that the directed verdict was proper because plaintiff failed to present a prima facie case of either negligence or a defective product. Because resolution of the questions we posed after oral arguments is found, after study of the entire matter, unnecessary to our affirmance of the directed verdict, we address issues 3 and 4 in only summary fashion.

Consideration of the effect of MRE 705 is not necessary to our decision because the rule did not take effect until long after the directed verdict was entered in this case.[5] The court followed the practice in effect at the time of trial.

The question of the applicability of the "crashworthiness" doctrine to the forklift manufacturing industry is likewise not necessary to our decision because, assuming applicability of the *Larsen* crashworthiness test in order to posture the evidence in the light most favorable to the plaintiff as we pass upon the directed verdict issue, plaintiff did not show that the design of the forklift was unreasonably dangerous in light of the foreseeable risks of injury. Therefore, the applicability of the "crashworthiness" test to forklift vehicles is not decided.

Our conclusion that the plaintiff did not present a prima facie case is based on the lack of evidence concerning both the magnitude of the risks involved and the reasonableness of the proposed alternative design. Although from the testimony of

_____

[5] The directed verdict was granted on November 18, 1976. MRE 705 was not effective until March 1, 1978.

plaintiff's expert one might infer that a forklift rollover and the injuries resulting from being pinned under the overhead protective guard were foreseeable, neither his testimony nor any other evidence on the record gave any indication how likely such an event might be. In conjunction with this uncertainty, the record also produces no indication how the use of any of the driver restraints would affect a forklift operator's ability to do his or her job or the operator's safety in other circumstances.

The nature of a forklift operator's work is not a function concerning which the Court is able to take judicial notice. We must look to the record to determine what showing was made that any of the proposed driver restraints would be compatible with the nature of a forklift operator's work. Especially in a case such as this, where the magnitude of the risks is quite uncertain because it is dependent upon the unknown incidence of forklift rollovers, an examination of the effects of any proposed alternative design must bear a heavy burden in determining whether the chosen design was unreasonably dangerous.

Little evidence was provided on these points. The only evidence concerning the nature of a forklift operator's work was one statement made by plaintiff's expert on cross-examination that he did not know whether most forklift drivers would be in the forklift the better part of their working day or whether they would be in and out of it. He said he had seen both types of operations. Concerning the effects of any of the proposed driver's restraints, the only testimony was a statement by the expert that certain types of seat belts allow some freedom of movement and would only lock

when jerked. Regarding whether seat belts would be used, the expert did not testify about the industry in question, but the workers at decedent's workplace indicated that they would not wear seat belts if they were provided. No evidence was provided concerning the effects of the use of the other restraints, and no cost estimates were provided for any of the restraints.

Viewing the evidence in a light most favorable to the plaintiff, we cannot conclude that plaintiff established a prima facie case for either negligence or a defective product. Even if this Court could take judicial notice that the costs involved in attaching a seat belt or other designated restraint to a forklift would not be great, we cannot take judicial notice that their use by forklift drivers would be likely, practical, or more safe. Neither the costs nor the effects of the other restraints were established.

Significantly, the defendant did offer the cage enclosure, which was one of the suggested restraints, as an option. The question then becomes whether such a cage enclosure should have been installed as standard equipment. Although plaintiff's expert acknowledged that some drivers are frequently in and out of their vehicles, there was no testimony concerning the effects of a cage upon the driver's ability to perform his or her work. There also was no factual testimony concerning the safety of an operator in a cage enclosure in a rollover or in any foreseeable accidents or emergencies other than rollovers. In short, we find no support in the record for the conclusion that the manufacturer, as opposed to the employer, would be in a better position to conclude that the cage

enclosure should be installed as standard equipment.

In the entirety of plaintiff's proofs, there is no data or other factual evidence concerning the magnitude of the risks involved, the utility or relative safety of the proposed alternatives, or evidence otherwise concerning the "unreasonableness" of risks arising from failure to install driver restraints on the subject forklift model as standard equipment.

Manufacturers are not insurers that "in every instance and under all circumstances no injury will result from the use" of their products. *E I DuPont de Nemours & Co v Baridon,* 73 F2d 26 (CA 8, 1934).

Therefore, we find that the trial court did not err. The plaintiff's evidence did not raise an issue of fact concerning any unreasonable risk at the time of the design or manufacture of the vehicle.
We affirm.

FITZGERALD, C.J., and KAVANAGH, WILLIAMS, LEVIN, RYAN and BLAIR MOODY, JR., JJ., concurred with COLEMAN, J.