28 F.3d 1214
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Edward SNIDER, Plaintiff-Appellee,
v.
The STANLEY WORKS, a/k/a Stanley-Bostitch, Inc., a foreign
corporation, Defendant-Appellant.
 No. 92-2161.
 United States Court of Appeals, Sixth Circuit.
 July 5, 1994.
 
 Before: MILBURN, RYAN, and BATCHELDER, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Edward Snider suffered a painful accidental injury while operating a pneumatic nailer designed and manufactured by Stanley Works. Snider sued Stanley for negligently designing the tool and on other theories, and won a verdict.
 
 
 2
 Stanley now appeals, claiming that the district court should have granted Stanley's motion for judgment as a matter of law on the design defect claim. Because we conclude that Snider failed to make out a prima facie case for negligent design under Michigan law, we reverse.
 
 I.
 
 3
 Stanley manufactured the tool involved in this law suit: the Bostitch N80C coil-fed pneumatic nailer, a power tool which uses compressed air to drive nails out of a magazine into a work surface. In order to operate the nailer, the operator must first press the contact element on the nose of the tool against the work surface with sufficient force to depress the spring-loaded work contact element and then squeeze the trigger. Only when both actions are taken simultaneously will the tool fire a nail. Unless the contact element is pressed against the work surface with the requisite force, squeezing the trigger will not cause the tool to discharge the nail.
 
 
 4
 Edward Snider is an experienced carpenter who has built a variety of structures using various tools of the trade, including the Bostitch N80C pneumatic nailer. In the spring of 1988, Snider was building a pole barn and was using the N80C nailer. He had nailed one end of a 12' long horizontal board to a vertical member and was about to nail the other end to a parallel vertical member when the board, which he was holding in his left hand, slipped from his grasp and knocked the nailer out of his right hand and onto his right knee. The falling board landed on the nailer and the weight of the board on the nailer pressed the contact element against Snider's right knee. As he lifted the board with his left hand and grasped the nailer with his right hand, Snider inadvertently pulled the trigger on the nailer, and the tool discharged a nail into his right knee causing injury.
 
 
 5
 Snider filed suit against Stanley in a Michigan Circuit Court. Stanley later removed the case on diversity grounds to federal district court. Snider initially alleged that Stanley (1) negligently designed the nailer, (2) breached an implied warranty, and (3) breached a warranty of merchantability. At trial, however, Snider pressed only the negligent design claim. Both Snider and Stanley introduced evidence on the negligence issue consisting of expert testimony and documentary evidence. Snider's theory was that the nailer was defectively designed because (1) it lacked a safety guard around the trigger, and (2) the contact element on the nose of the nailer was too sensitive and did not meet industry safety standards for pneumatic nailers.
 
 
 6
 At the close of the plaintiff's proof, Stanley moved for judgment as a matter of law under Fed.R.Civ.P. 50(a), arguing that the plaintiff had not established a prima facie case of negligent design defect under Michigan law. The district court denied the motion and denied Stanley's second motion at the close of the case. The case went to the jury and the jury returned a verdict for Snider, awarding $90,000 in damages reduced by twenty percent for Snider's comparative negligence. Accordingly, the district court entered a $72,000 judgment for Snider. Stanley renewed its motion for judgment as a matter of law, and moved in the alternative for a new trial under Fed.R.Civ.P. 59(a). The district court denied both motions. Stanley now appeals.
 
 II.
 
 7
 At the outset, we note that this circuit "adheres to the minority rule that state law governs the standard for granting motions for directed verdicts and judgments notwithstanding the verdict." J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1482 (6th Cir.1991). Under Michigan law, courts passing on a motion for judgment as a matter of law must view the evidence in the light most favorable to the nonmoving party and give the nonmoving party the benefit of every reasonable inference that could be drawn from the evidence. Matross v. Amoco Oil Co., 385 N.W.2d 586, 588 (Mich.1986). The motion must be denied if there is any evidence that could allow reasonable jurors to reach different conclusions about the evidence. Id. Only if the nonmoving party has failed to establish a prima facie case may the court enter judgment as a matter of law. Kinzie v. AMF Lawn & Garden, Inc., 423 N.W.2d 253, 256 (Mich.Ct.App.), appeal denied, 431 Mich. 863 (1988). Finally, we review a district court's determination of state law de novo. Salve Regina College v. Russell, 499 U.S. 225, 239 (1991).
 
 
 8
 Stanley argues that Snider's claim should not have gone to the jury because, under Michigan law, Snider failed to establish a prima facie case of negligent design defect. Under Michigan tort law, a manufacturer has a duty to design its product so as to eliminate any unreasonable risk of foreseeable injury. Owens v. Allis-Chalmers Corp., 326 N.W.2d 372, 377 (1982). The Michigan Supreme Court has adopted a "pure negligence, risk-utility test" for determining whether a manufacturer can be held liable for injuries caused by defectively designed products. Prentis v. Yale Mfg. Co., 365 N.W.2d 176, 186 (1984). Owens requires that a plaintiff's prima facie case must include
 
 
 9
 data or other factual evidence concerning the magnitude of the risks involved, the utility or relative safety of the proposed alternatives, or evidence otherwise concerning the "unreasonableness" of risks arising from [the alleged defect].
 
 
 10
 326 N.W.2d at 379. In Reeves v. Cincinnati, Inc., 439 N.W.2d 326 (1989), appeal denied, 434 Mich. 895 (1990), the Michigan Court of Appeals restated the standard:
 
 
 11
 [A] prima facie case of a design defect premised upon the omission of a safety device requires first a showing of the magnitude of foreseeable risks, including the likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of injuries sustainable from such an accident. It secondly requires a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger.
 
 
 12
 Id. at 329. One of the rationales for adopting negligence as the criteria for liability in design defect cases is that a verdict for the plaintiff is "the equivalent of a determination that an entire product line is defective." Prentis, 365 N.W.2d at 185. It is axiomatic that in a design defect case the defect is not the result of a deviation from the manufacturer's chosen design but rather the result of the unsafe nature of the design itself. Richard A. Epstein, Modern Products Liability Law 69 (1980); see also, Marshall S. Shapo, The Law of Products Liability p 23.11[d] (1990). Taken together, Prentis, Owens, and Reeves establish the elements for a prima facie case for design defect in Michigan, elements we think Snider failed to satisfy.
 
 
 13
 Snider's burden under Michigan law was to show more than an accidental injury that might have been avoided had the nailer been designed differently. His obligation was to show that the nailer's design, which lacked a trigger guard and which lacked a stronger nose spring, created an unreasonable risk of injury that was foreseeable and that an alternative design would reasonably have minimized that risk. That burden is met, according to Michigan's design defect law, by the introduction of evidence showing the magnitude of the risk of injury from the tool as designed--the likelihood and foreseeability of injury--and evidence of the utility or practicality of the alternate design. The defendant claims that the plaintiff did not carry his burden. We think the defendant is correct.
 
 
 14
 Snider offered no evidence whatever concerning the magnitude of the risk that was likely to occur because of the tool's design. To establish that the risk of accidental or unintentional firing was foreseeable, Snider relied on the American National Standard ANSI/ISANTA minimum industry standards, Stanley's operation and maintenance manual for the nailer, and the testimony of Stanley's expert, its director of engineering. The most that can be said for this evidence, however, is that it tended to show that Stanley was aware of the possibility of an accidental activation of the tool. That evidence, viewed in the light most favorable to the plaintiff, failed to establish anything, however, concerning the likelihood of such an accident. There was no evidence, for example, that such an accident or one like it had ever occurred before or since to suggest the foreseeability of the injury. In Petto v. Raymond Corp., 431 N.W.2d 44, 47 (Mich.Ct.App.1988), appeal denied, 433 Mich. 879 (1989), the plaintiff was held to have failed to make out a prima facie case, in part, because of the lack of evidence concerning the frequency of accidents such as his.
 
 
 15
 This was an unusual and unfortunate accident that was the result of a rather complex chain of odd events. A board fell on top of the nailer, evidently pressing the nailer's spring head against Snider's knee. When Snider attempted to remove the nailer, he accidently squeezed the trigger, causing the tool to drive a nail into his knee.
 
 
 16
 But in Michigan, liability for design defect does not follow automatically upon a showing that an accident and an injury that occurred while using a product very likely would not have occurred if the product had been designed as the plaintiff suggests. Rather, the "magnitude of the risk" component of Michigan's rule requires a showing that the tool design chosen is defective because it failed to eliminate the unreasonable risk of injury that was foreseeable. The plaintiff's proofs simply failed to include any evidence concerning the magnitude of the risk at all, or its foreseeability.
 
 
 17
 Snider's prima facie case was lacking in another critical respect as well. He failed to offer any evidence to establish the second component of Michigan's design defect formula: "the utility or relative safety of the proposed alternative[ ] [design]." Owens, 326 N.W.2d at 379. As the Owens court held, the plaintiff must present evidence establishing the reasonableness of other design alternatives:
 
 
 18
 [A]n examination of the effects of any proposed alternative design must bear a heavy burden in determining whether the chosen design was unreasonably dangerous.
 
 
 19
 Id. Thus, the plaintiff must demonstrate that his proposed alternative design "would have been effective as a reasonable means of minimizing the foreseeable risk of danger." Reeves, 439 N.W.2d at 329. Snider's expert suggested that a trigger guard could have been added to the nailer to protect against a user accidentally squeezing the trigger. But Owens requires that the plaintiff in a design defect case show how the use of any of the improvements suggested by the expert would affect an operator's ability to do his job, or the operator's safety in other circumstances. 326 N.W.2d at 379. Simply put, Snider failed to show how his proposed improvement would impact those persons who used the product. Id. Moreover, Snider's expert offered no testimony on whether his proposed alternative design--in this case a trigger guard and a stronger spring--would actually result in fewer accidents. Snider's own expert testified that none of the manufacturers of pneumatic nailers included a trigger guard on its product. More to the point, the defendant's expert testified that a trigger guard would itself cause more accidents because the guard induces the user to keep his finger on the nailer's trigger or to modify the nailer to circumvent the safety mechanism.
 
 
 20
 Snider's case has even less substance in regard to his allegation that the nailer was defective because the spring in the nailer's contact element was too weak. In a product liability case, the plaintiff has the burden of establishing that the product was defective when it left the manufacturer; the defect must be attributable to the manufacturer. Holloway v. General Motors Corp., 271 N.W.2d 777, 780 (Mich.1978).
 
 
 21
 [P]utting an expert on the stand is not a wand that may be waived over a cause of action. Each element of the claim requires proof. If the plaintiff relies on an expert to show a defect, the case will still fail if there is no evidence, from the expert or otherwise, that the defect existed at the time the product left the manufacturer.
 
 
 22
 Shapo, The Law of Products Liability p 23.06[j][i] at 23-30. Under Michigan law, where the defect is in a relatively inaccessible part integral to the product and "not generally required to be repaired, replaced or maintained, it may be reasonable, absent misuse, to infer that the defect is attributable to the manufacturer." Holloway, 217 N.W.2d at 782. The problem in this case is that Snider failed to introduce any evidence to support an inference that the part played by a weak nose spring in causing the accident was probably attributable to Stanley's defective design of the tool's nose spring mechanism. Snider offered no evidence that the allegedly weak spring was a defect common to the entire product line. Snider's expert witness was unfamiliar with pneumatic nailers. He admitted that he had never used one prior to being hired to testify in this case, did not know how the internal mechanisms operated in the tool, had not disassembled the tool in this case, and thus had not examined the nose spring he claimed contributed to the accident. Finally, Snider's expert admitted that he never tested the nailer's spring and had not examined other Stanley nailers, so he could not offer any comparisons between the spring mechanism in Snider's nailer and those found in the rest of the product line. Under these facts, we conclude that the plaintiff has failed to establish a prima facie case.
 
 
 23
 Owens and Prentis make clear that, in Michigan, defective design cannot be proved by a mere assertion that a particular design is dangerous or that a different design would have alleviated or prevented the plaintiff's injuries. The challenged design must be shown to be unreasonably dangerous. This requires that the plaintiff present evidence from which a factfinder can consider both the magnitude of the risk associated with the design in question and the relative utility and safety of the challenged design. After a careful review of the record, we conclude that Snider failed to establish a prima facie case for design defect.
 
 III.
 
 24
 The judgment is REVERSED.
 
 
 25
 MILBURN, Circuit Judge, dissenting.
 
 
 26
 In this diversity products liability case governed by Michigan law, the majority has reversed a jury verdict in favor of plaintiff Snider concluding that he failed to establish a prima facie case of a negligent design defect. I disagree and therefore respectfully dissent.
 
 
 27
 As the majority has stated, Michigan law requires that a plaintiff alleging negligence in the design of a product must show "the magnitude of the risks involved" in the chosen design and "the reasonableness of the proposed alternative design." Owens v. Allis-Chalmers Corp., 326 N.W. 372, 378-79 (Mich.1982). This is so because under Michigan law the jury engages in a "risk-utility" analysis to determine whether the manufacturer's design was unreasonably dangerous in light of the risks attached to it and the relative ease or difficulty with which those risks might have been lessened by a different design.
 
 
 28
 When a jury decides that the risk of harm outweighs the utility of a particular design (that the product is not as safe as it should be) it is saying that in choosing the particular design and cost trade-offs, the manufacturer exposed the consumer to greater risk of danger than he should have.
 
 
 29
 Prentis v. Yale Mfg. Co., 365 N.W.2d 176, 184 (Mich.1984) (quoting Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 Vand.L.Rev. 593, 610 (1980) (quoting Barker v. Lull Engineering, 573 P.2d 443 (Cal.1978)).
 
 
 30
 The district court found sufficient evidence of the magnitude of the risk involved in this case in the testimony of Ronald Steger, plaintiff's expert witness, in the technical literature and safety standards concerning pneumatic nailers, and in the admissions of defendant's expert witness. Statistical evidence concerning the likelihood of accident and injury, i.e., the magnitude of the risk, is not required. Reeves v. Cincinnati, Inc., 439 N.W.2d 326, 330 (Mich.App.1989).
 
 
 31
 The majority states incorrectly: "Snider offered no evidence whatever concerning the magnitude of the risk that was likely to occur because of the tool's design." Plaintiff's expert, a consulting engineer with an extensive mechanical engineering background, testified that the N80C nailer as designed posed a risk of "very severe" injury. J.A. 150. He also testified concerning the American National Standards Institute ("ANSI") safety standards applicable to the defendant's nailer. One standard required that "[t]he work contact element shall prevent the tool from operating unless the work contacting element is under a force greater than the weight of the tool." J.A. 148. Plaintiff's expert testified that the nailer failed to meet this standard because the weight of the tool alone was sufficient to depress the spring in the work contact element so as to allow the discharge of a nail. Another standard required that "[t]he operating control [trigger] shall be designed and located on the tool so as to protect the operating control from unintentional actuation." J.A. 149. Plaintiff's expert further testified that the design of the nailer failed to meet this standard because the nailer lacked a simple trigger guard. The standards, which defendant Stanley participated in formulating, are evidence of foreseeable risk because their purpose is to lessen that risk. See Phillips v. Hardware Wholesalers, Inc., 762 F.2d 46, 49 (6th Cir.1985).
 
 
 32
 Plaintiff also introduced into evidence the nailer's operation and maintenance manual. This manual contained numerous warnings, two or three warnings on every page of text, about the potential dangers of the tool. One of the warnings stated that "serious injury could result if the 'contact arm' is accidentally bumped against someone or something, causing the tool to cycle." J.A. 219. The "contact arm" is the work contact element of the tool. Thus, defendant's own publication discusses the dangers of the tool and warns that serious injury could result if a nail were accidentally driven into a person.
 
 
 33
 Finally, defendant Stanley's own expert witness, Robert Olmstead, admitted, "I'm aware that users of our tools have been injured when they've accidentally driven a nail into themselves...." J.A. 198. He also admitted that the intent of the ANSI Standard 4.3.2, which requires a work contact element of sufficient strength "to prevent the tool from operating unless the work contacting element is under a force greater than the weight of the tool," is to prevent the unintentional functioning of the tool when it has come to rest on its work contact element.
 
 
 34
 The intent of that spec is when an operator sets that tool down, he's working on something, he sets it down, the tool is sitting there and it's resting at that point partly on the canister and partly on the trip [work contact element]. Typically in a lot of construction sites, there is steel around or there is a concrete slab. The intent of that spec was that when the operator reaches over and grabs that tool and pulls the trigger, that the trip will not have been moved by the weight of the tool into a position where the tool would be fired so that should a nail be fired into concrete or a concrete slab or a piece of steel, that that nail won't curve out and come flying out and possibly hit him in the eye. That was what the original intent of the spec was.
 
 
 35
 J.A. 196-97 (emphasis added). Naturally, the specifications should also protect the operator of the nailer in the event the tool came to rest against a part of the human body.
 
 
 36
 Furthermore, according to Olmstead, defendant knew the likely results of an accidental firing of a nail into the human body because, as he testified, it had conducted experiments in which it fired nails into the carcass of a pig. Taken together, this evidence establishes the "magnitude of the risk" element in plaintiff's prima facie case. Defendant admitted that it knew the industry standards, that it designed its product so as to minimize the risk of injury to humans that it could clearly foresee, that it warned operators of these risks in its owner's manual, and that it conducted tests to determine the extent of the risks so obviously connected to the use of a high-powered tool that fires a sharp, metal dart.
 
 
 37
 In view of the fact that statistical evidence of the probability of injury is not required of a plaintiff by the Michigan courts, the district court did not err in allowing this case to go to the jury. Viewed in the light most favorable to the plaintiff, the evidence showed that defendant could and did anticipate projectile injuries to users of its tool in that it specifically designed and warned against them. Plaintiff therefore made out a prima facie case that his severe injury was reasonably foreseeable by the defendant.
 
 
 38
 The majority also incorrectly states that plaintiff failed to establish a prima facie case in that plaintiff "failed to offer any evidence to establish the second component of Michigan's design defect formula: 'the utility or relative safety of the proposed alternative[ ] [design].' " This kind of proof is necessary because the
 
 
 39
 [r]isk-utility analysis in this context always involves assessment of the decisions made by manufacturers with respect to the design of their products. "The law purports to stand as a watchdog to insure that product design decisions made by manufacturers do not expose product users to unreasonable risks of injury. Thus, in a design defect case, the issue is whether the manufacturer properly weighed the alternatives and evaluated the trade-offs and thereby developed a reasonably safe product...."
 
 
 40
 Prentis, 365 N.W.2d at 183-84 (quoting Twerski, Weinstein, Donaher & Piehler, Shifting Perspectives in Products Liability: From Quality to Process Standards, 55 N.Y.U.L.Rev. 347, 359 (1980)).
 
 
 41
 The factors to be weighed in the risk-utility balance include, but are not limited to, the design or performance requirements of the product, the effects of those requirements on reducing hazards, the utility and cost of the product, and current technological capabilities. Prentis, 365 N.W.2d at 184 n. 24. The jury must be in a position to evaluate "the alternative design in terms of its additional utility as a safety measure and its trade-offs against the costs and effective use of the product." Reeves, 439 N.W.2d at 329.
 
 
 42
 Viewed in the light most favorable to the plaintiff, there was ample evidence of reasonable design alternatives. Plaintiff's expert suggested that a simple and inexpensive trigger guard could have been added to the nailer to protect against accidental actuation of the trigger, and he testified that such an addition, without affecting the performance of the nailer, might have prevented the injury to plaintiff.
 
 
 43
 During discovery, plaintiff sought to discover whether defendant had any documents or studies concerning the wisdom of adding a trigger guard to the pneumatic nailer. He asked defendant to "[p]roduce any and all documents which in any way deal with the pros and cons of incorporating a trigger guard on an N80C pneumatic nailer." Defendant's response was, "Does not exist." J.A. 193. With no data available from the manufacturer, plaintiff's expert compared the nailer to other power tools designed for cutting or penetration, such as drills and saws. He testified that these other tools had trigger guards, thus showing that such a safety devices were available. Plaintiff's expert further testified that a trigger guard would be very inexpensive and that the addition of a trigger guard would not make the nailer more difficult to use.
 
 
 44
 The majority points out that none of defendant's competitors' nailers have trigger guards, and defendant's expert witness testified that "we have studies to confirm our belief, that if a stronger trigger guard is put around this trigger, the operator will be encouraged to keep his finger on the trigger." J.A. 183. The fact that defendant's expert disagreed with plaintiff's expert over the advisability of a trigger guard does not mean that plaintiff did not adduce evidence for the jury to weigh in its risk-utility balance. As we have stated:
 
 
 45
 [Plaintiff's expert] testified that the alternatives he proposed were available, reasonably efficient, and safe; he further described some of the disadvantages associated with the alternatives. This testimony was adequate to meet [plaintiff's] burden of adducing evidence of the reasonableness of the alternatives. It is the province of the jury, not the expert, to weigh the advantages and disadvantages that the expert has identified. "While the jury may properly consider such countervailing evidence regarding the practicality of alternate designs, the reasonableness of protective or preventative measures remains an issue to be decided by the jury after considering all of the evidence."
 
 
 46
 Phillips v. Hardware Wholesalers, Inc., 762 F.2d 46, 49 (quoting Foster v. Caterpillar Tractor Co., 714 F.2d at 654, 657 (6th Cir.1983)).
 
 
 47
 The same may be said about plaintiff's proof concerning the reasonableness of installing a stronger spring in the work contact element of the nailer in order to meet the ANSI standard. Plaintiff's expert testified that a stronger spring would have prevented the inadvertent actuation of the nailer in this case, that the spring would have been inexpensive, and that a stronger spring would not have detracted from the performance of the nailer. He also suggested that stronger springs were readily available in the market. This evidence establishes that a trigger guard and a stronger spring were reasonable design alternatives in that they were inexpensive, available, and useful for their purposes without detracting from the nailer's utility. That is prima facie proof that other designs were available and were reasonable, and the challenged design was shown to be unreasonably dangerous.
 
 
 48
 As the district court found, plaintiff presented a prima facie case that the risk of injury to him was foreseeable and that design alternatives that would have eliminated or reduced that risk were available. Plaintiff has thus presented a prima facie case of the defective design of defendant's product, and the district court therefore correctly submitted this case to the jury and subsequently denied defendant's motions for judgment as a matter of law. Accordingly, I would affirm the district court.