# STATE OF MICHIGAN

# COURT OF APPEALS

---

CHARLES LAVIN and VANESSA LAVIN,

        Plaintiffs-Appellants,

v

EDUARDO CONTE,

        Defendant,

and

NORTH CENTRAL WELDING COMPANY,
doing business as NUCRAFT METAL
PRODUCTS,

        Defendant-Appellee.

UNPUBLISHED
July 25, 2017

No. 332165
Crawford Circuit Court
LC No. 13-009136-NO

---

Before: SERVITTO, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

In this products liability action, plaintiffs appeal by right a February 5, 2016, trial court order granting summary disposition in favor of defendant North Central Welding Company (d/b/a NuCraft Metal Products (NuCraft)) pursuant to MCR 2.116(C)(10). For the reasons set forth in this opinion, we affirm.

## I. FACTS

This action arises from the injuries sustained by Vanessa Lavin that occurred on June 1, 2013. Sometime before the day of the accident, Charles Lavin purchased a boat hoist and a canopy frame manufactured and sold by defendant NuCraft. Charles also purchased a vinyl canopy from defendant[1]; defendant did not manufacture the vinyl canopy, but did manufacture and design the canopy frame and the method by which to attach the canopy to the frame.

---

[1] Hereinafter we will refer to NuCraft as "defendant;" Eduardo Conte is no longer a party to this action.

-1-

Charles planned to use the hoist and the canopy assembly for a pontoon boat that he kept at his mother's cottage on Lake Margrethe. Charles assembled the boat hoist on dry land and then transported it into the lake where he planned to stow the pontoon boat. Charles also assembled the canopy frame and attached the frame to the boat hoist.

According to Charles, on June 1, 2013, he, Vanessa, Eduardo Conte, and John Lavin were present at Charles' mother's cottage. According to Charles, "[w]e launched the boat at some point that day, and we brought the pontoon to the lift and put the pontoon on the lift . . .". Charles stated that at some time in the evening, someone mentioned that it might rain, and the group decided to install the canopy on the boat hoist. Charles continued that the three men retrieved the canopy from the garage, transported it to the dock, and then "cranked the boat up as high as we could with the fabric on it, and then we fed it up through the top of the canopy." The four individuals then proceeded to attempt to install the canopy on the canopy frame. Vanessa remembered standing on the back of the boat on a seat helping the group position the canopy. According to Charles, he "looked back at [Conte] and I heard a splash." According to Vanessa, she was standing on the "seatback," which she explained was "like a bench on top [where] people lay there and sun themselves. . .". Vanessa continued, "I was standing on the seat reaching up holding on to the canvas, and then I wasn't. It was gone out of my hands and I was falling." Vanessa elaborated, "I was falling face first, initially thinking I would belly flop . . . but I landed directly on top of my head . . .". According to Vanessa, "I remember someone lifting me out of the water, and when my eyes opened, it was [Charles]." Vanessa fell into the shallow water, severed here spinal cord and was rendered a quadriplegic.

The vinyl canopy did not come with instructions or an assembly sheet. Charles testified that, at some point before the night of the accident, he spoke with Ronald Wiltse, defendant's vice president, regarding the best way to install the canopy. Charles testified as follows:

*Q*. Okay. Tell me precisely what Ron told you about installation of the frame and canopy.

*A*. Well, I remember [] so I asked him if there was any trick to putting the - - to lifting the canopy on because I wasn't familiar with it. And he said, no, it's the simplest part. You just get the boat up and get all your stuff on there and install it and just make sure- -I remember him commenting about make sure there's no wind.

*Q*. Get the boat up?

*A*. As high as you can.

*Q*. Make sure there's no wind.

*A*. Yeah.

Wiltse testified that defendant manufactured boat lifts and the canopy frame for the boat lift. Defendant then contracted with another company to supply the vinyl canopy to fit the frame. Defendant designed and manufactured the method by which the vinyl attached to the frame, which attached to the boat hoist. Wiltse testified that the vinyl canopy that Charles purchased

weighed about 60-70 pounds and was 28-feet long by 126-inches wide. Wiltse testified that defendant included assembly sheets for the frame, but not for the vinyl canopy and defendant did not provide any other instructions on how to install the canopy. Wiltse testified that it was up to the customer to decide how to safely install the vinyl canopy, and testified as follows about installing the canopy:

> *Q.* So when this frame is put onto the telescoping arms that are on the hoist, how is it that you recommend that someone get the vinyl on top of the framing structure, which by your own admission when it's sitting on the floor is probably over seven feet tall?

> *A.* Off a dock, off a ladder, there's a lot of means to do it. These telescoping arms can be lowered or adjusted up and down. We don't recommend people getting on their boats just because of the cable breakage issue.

> *Q.* Is it foreseeable that people would try and get on the boats and/or climb on the lift to get the vinyl on top of the framing structure?

> *A.* People are capable of doing anything, you know. That's a wide open question there.

> \* \* \*

> *Q.* Did you consider how it was that people were going to be able to get to the middle of this framing structure . . . how were people supposed to get the vinyl in the middle of this framing structure without climbing on the boat and/or the boat lift while they're putting the vinyl on?

> *A.* They can do it with ladders on shore. I've done it that way.

> *Q.* Ladders on shore?

> *A.* Ladders on shore, a dock on the side, some people have docks that wrap around. It can be done in a lot of different ways without getting on the boat.

> *Q.* Did you recommend anywhere in the instructions that that's the manner that be used?

> *A.* No.

> *Q.* Did you provide any instruction whatsoever about how to get the vinyl onto the framing structure?

> *A.* No.

> \* \* \*

*Q.* Well, there was any consideration to allowing for the framing system to actually move - - be moved up and down . . . so the vinyl could be put on and then cranked back up?

*A.* It could be let down manually . . . There are telescoping arms that can go up and down on it. And you can actually slide it up and back and forth, too, to get at one end of the canopy and just loosen up four bolts and you can slide it either way.

*Q.* Were those instructions ever provided to the end user?

*A.* It's in the assembly. You can put it anywhere you want to, you don't have to bolt it in one place. I mean when you put the canopy in place, you can see that, it's visible, you see the multiple holes, you see the clamps . . . so if I have to tell them they can loosen those up and move them back and forth, no, I didn't do that.

Wiltse later testified concerning how many customers installed their canopies:

I think probably for the most part people are probably getting on their boats which . . . we warn the heck out of them . . . it's just something they should not be doing. But . . . if people invested the time or the money into ladders, maybe built a dock around the hoist to prevent that from happening, it would be a much easier way to put it on. I mean you gotta admit to that. The boat's usually not long enough to get to each end, so . . . just a simple dock going around the hoist, it could save a lot of problems.

Defendant submitted evidence that the hoist contained the word "danger" and several warnings on stickers stating, "[f]ailure to follow below instructions will result in uncontrolled spindown and possible personal injury and or hoist damage . . . . <u>Do not</u> work or play on, around or under hoist with boat in." Additionally, what appears to be a separate sticker states, "Warning . . . SAFETY PRECAUTIONS" and continues, "Do not allow people to occupy your craft or stand on the guideon while hoist is in raised position. CABLE BREAKAGE CAN OCCUR AT ANY TIME." That sticker also states, "Do not work on craft in raised position."

Bartley Eckhardt, a licensed engineer, stated that he "developed a safer alternative design that permits people to install the canopy structure and the canvas while working from ground level." Eckhardt continued, "[t]hat design uses essentially the same design features that [defendant] uses now with telescope and corner posts, but the corner post support, instead of being attached to the ridged portion of the hoist, these are attached to the moveable portion." Eckhardt explained that the moveable portion is "the portion . . . that the boat is in contact [with] and that whole bed that gets lifted up with the boat on it." "Springtime," Eckhardt stated, "you drag this lift down to the water, you lower the telescoping corner posts, you install . . . the structure for the top if it['s] not already installed. . . . You install the canvas working from ground level and then you raise the canopy supports." Asked if any boat hoist manufacturers use a similar design, Eckhardt responded "I did not see a single hoist manufacturer that uses this.

They, for all intent[s] and purpose[s], offer the same awful arrangement." Eckhardt testified that he had "several sketches" of his design and submitted them during his deposition.

Regarding whether Eckhardt had spoken with any manufacturers about the feasibility of his design, Eckhardt answered, "I consider myself in the industry, but I didn't call another boat manufacturer . . . to get any commentary. I don't know why I would do that." Asked if he performed a cost analysis regarding his design, Eckhardt replied as follows:

> Some, but I quickly realized that whatever subtle differences there are in cost with the structure are safe because the canopy becomes smaller, and so to me, it's an offset. It's a net neutral cost.

> \* \* \*

> The canopy structure is the same conceptually. The telescoping corners are the same. The only difference is you need a little bit more tubing in the corners, and the gusseting arrangement is a little bit different. But in my experience, this adds negligibly to the cost and it's offset by having less canopy material.

Pressed on whether he performed a cost analysis, Eckhardt stated, "Not in detail, but . . . I looked at it based on my education, training, experience and so on, and I realized that the parts that have to be added are essentially inconsequential to the price. But . . . I could certainly do that." Asked if he had searched the Internet to inquire whether another manufacture used a design similar to his, Eckhardt stated, "I have, and I don't see anybody that calls for the canopy support to be on the moveable portion. There is another manufacturer . . . that provides scaffolding on the moveable portion."

The original two-count complaint for negligence and loss of consortium named Eduardo Conte as the sole defendant. Conte asserted that defendant NuCraft was the proximate cause of Vanessa's injuries. Subsequently, plaintiffs added NuCraft as a defendant. Plaintiffs alleged product liability, negligent design and manufacture, failure to warn, and breach of implied or express warranties, along with negligence, gross negligence and breach of warranties against defendant. Charles additionally alleged negligent infliction of emotional distress and loss of consortium against defendant. Following plaintiffs' second amended complaint, the parties agreed to dismiss Conte with prejudice.

Thereafter, defendant moved for summary disposition under MCR 2.116(C)(8) and (C)(10). Defendant argued that plaintiffs could not state a prima facie case for negligent design and manufacture because plaintiffs could not establish there was a safer alternative design, and the boat hoist was in its intended condition. Defendant also argued that plaintiffs' failure-to-warn claims should fail because stickers on the boat hoist warned consumers not to work from a boat while it was on the hoist in a raised position. Defendant also argued that Charles could not maintain a claim for negligent infliction of emotional distress because he failed to establish that he suffered physical harm as a result of observing his wife's accident. Defendant further argued that Charles' loss of consortium claim was derivative of Vanessa's negligence claims, and thus could not be maintained.

In response, plaintiffs argued that a safer alternative design existed in the form of Eckhardt's design, which plaintiffs asserted Eckhardt created to eliminate risks associated with designs such as defendant's. Plaintiffs also argued that the design of the boat hoist carried a latent defect because it forced consumers to work from an elevated height, and that Wiltse directed Charles to use the hoist in this manner. Plaintiffs argued that defendant failed to warn in connection with foreseeable use or misuse of its product because the risk of injury was not obvious, as the risk was working from height rather than falling as a result of the hoist cables' breaking. Plaintiffs argued that defendant breached the implied warranty of fitness for use because there was no safe way to install the canopy on the hoist.

The trial court granted summary disposition in favor of defendant. The trial court reasoned that many boat hoists operate in the same manner as defendant's, and thus there was no defect in the design that forced consumers to work at a height. Additionally, the trial court explained that the design was not inherently defective because there were no faulty cables, bad joints, or other defects that could cause injury. The trial court reasoned that plaintiffs could have ignored the advice given by Wiltse, but choose to follow that advice and ignore the warning labels on the boat hoist, and Vanessa never had contact with Wiltse. The trial court further held that no reasonable jury could conclude that the circumstances surrounding Vanessa's injuries were a foreseeable result of the boat hoist's design. Finally, the court explained that the testimony of plaintiffs' expert was insufficient to state a prima facie case.

Plaintiffs moved for reconsideration, arguing that the trial court made improper credibility determinations regarding plaintiffs' expert, which the trial court denied, explaining that "even if the expert's testimony was viewed in a light most favorable to the Plaintiffs, no reasonable jury could conclude that the circumstances which led to Mrs. Lavin falling were a foreseeable result of the design of the hoist." This appeal ensued.

## II. STANDARD OF REVIEW

We "review[] the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Id.*]

"[A]ll reasonable inferences are resolved in the nonmoving party's favor." *Hampton v Waste Mgt of Mich, Inc*, 236 Mich App 598, 602; 601 NW2d 172 (1999).

It appears that the trial court granted summary disposition on the two derivative claims pursuant to MCR 2.116(C)(8). This Court reviews de novo a grant of summary disposition under MCR 2.116(C)(8). *King v Mich State Police Dep't*, 303 Mich App 162, 188; 841 NW2d

-6-

914 (2013). A motion under MCR 2.116(C)(8) "tests the legal sufficiency of the claim on the basis of the pleadings alone," and the "court must accept as true all factual allegations contained in the complaint." *Id*. The court must grant the motion "if no factual development could justify the plaintiff's claim for relief." *Id*.

## III. ANALYSIS

Plaintiffs argue that there were issues of fact regarding whether the canopy and lift were defectively designed and whether defendant adequately warned of the dangers posed by the lift and canopy system. Apart from these arguments and the arguments concerning their derivative claims discussed below, plaintiffs do not advance any arguments concerning their other claims. Accordingly, we will treat those claims as having been abandoned.

## A. DESIGN DEFECT

There are two theories that support a claim for negligent design. *Gregory v Cincinnati Inc*, 450 Mich 1, 11; 538 NW2d 325 (1995). The "more traditional means of proving negligent design questions whether the design chosen renders the product defective, i.e., whether a risk-utility analysis favored an available safer alternative." *Id*. Courts, however, "have never gone so far as to make sellers insurers of their products and thus absolutely liable for any and all injuries sustained from the use of those products." *Prentis v Yale Mfg Co*, 421 Mich 670, 682-683; 365 NW2d 176 (1984).

In order to establish a prima facie case of negligent design, a plaintiff must show "data or other factual evidence concerning the magnitude of the risks involved, the utility or relative safety of the proposed alternatives, or evidence otherwise concerning the "unreasonableness" of risks arising from the allegedly defective design. *Owens v Allis-Chalmers Corp*, 414 Mich 413, 432; 326 NW2d 372 (1982). In product liability actions for production defects,[2] a manufacturer is not liable unless "the plaintiff establishes that the product was not reasonably safe at the time the specific unit of the product left the control of the manufacturer . . . ." MCL 600.2946(2). A plaintiff must also establish that under "generally accepted production practices at the time" the allegedly defective product left the control of the defendant, "a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater risk of harm to others." *Id*.

> An alternative production practice is practical and feasible only if the technical, medical, or scientific knowledge relating to production of the product, at the time the specific unit of the product left the control of the manufacturer or seller, was developed, available, and capable of use in the production of the product and was economically feasible for use by the manufacturer. Technical, medical, or scientific knowledge is not economically feasible for use by the manufacturer if use of

---

[2] "Production" includes manufacture, design, or labeling. MCL 600.2945(i).

that knowledge in production of the product would significantly compromise the product's usefulness or desirability. [*Id.*]

Here, Eckhardt stated that he had designed a boat hoist that eliminated the potential hazard of a consumer's falling into the water while attempting to install a canopy. According to Eckhardt, the design was similar to the one already in use by defendant, the major difference being that telescoping poles would be added to the moveable portion of the dock, allowing the consumer to install the canopy while working on the ground. Eckhardt opined that the addition to the cost of the unit would be negligible, and that his design would actually be more practical because it would reduce the risks associated with wind forcing the canopy upward. Eckhardt described a design that appeared to be "capable of use in the production of the product," MCL 600.2946(2), having stated that it was minimally different and "economically feasible for use by the manufacturer," *id.*, because of the negligible cost. However, an alternative production practice must be available "at the time the specific unit of the product left the control of the manufacturer." *Id.*

Plaintiffs presented no evidence that Eckhardt's design existed before 2011, when the subject hoist was manufactured. Moreover, Eckhardt stated that he could find no manufacturer that utilized something similar to his design, only one that utilized scaffolding to assist the consumer in installing the canopy. Eckhardt admitted that he had neither performed a cost-utility analysis, nor spoken to manufacturers about the feasibility of the design. Thus, plaintiffs failed to present evidence that Eckhardt's design was "developed," "available," and "economically feasible." MCL 600.2946(2). Because plaintiffs failed to present evidence meeting the statutory standard, the trial court properly granted summary disposition as to plaintiffs' design defect theory of negligent design without resort to a credibility determination regarding Eckhardt's deposition testimony.

## B. FAILURE TO WARN

The other theory of proving a claim of negligent design involves proving a failure to warn, which "includes the duty to warn about dangers regarding the intended uses of the product, as well as foreseeable misuses." *Gregory*, 450 Mich at 11. However, under MCL 600.2948(2)

A manufacturer has no duty to warn of a material risk associated with the use of a product if the risk: (1) is obvious, or should be obvious, to a reasonably prudent product user, or (2) is or should be a matter of common knowledge to a person in the same or a similar position as the person upon whose injury or death the claim is based." [*Greene v AP Prod, Ltd*, 475 Mich 502, 509; 717 NW2d 855 (2006).]

A "material risk" is "an important or significant exposure to the chance of injury or loss." *Id*.

The trial court did not err in finding that there was no question of fact regarding whether defendant breached its duty to warn about the danger of installing the canopy. The risk at issue in this case was falling from atop the hoisted boat while attempting to install the canopy. This risk was obvious or should have been obvious to a reasonably prudent product user. *Id*. Furthermore, it should be a matter of common knowledge to a person in the same or similar

position as plaintiffs to understand that there is an inherent risk of falling while installing a canopy from atop a pontoon boat that is elevated on a boat hoist. *Id*. The boat was elevated on a hoist and the canopy was heavy and difficult to install. A reasonably prudent user of the canopy would understand the risk of falling that was inherent in attempting to install the canopy while working from atop the boat. Moreover, even assuming that defendant did have a duty to warn, there was no question of fact regarding whether defendant met its burden to apprise plaintiffs of the risks associated with working from atop the boat. Here, the boat hoist contained stickers warning consumers not to occupy the boat while it was on the hoist. The stickers also warned consumers not to work from the boat. Hence, even with Wiltse's alleged instructions, plaintiffs were warned by the stickers not to work from the boat. Accordingly, there were no genuine issues of material fact regarding plaintiffs' failure to warn theory and the trial court did not err in granting summary disposition as to plaintiffs' negligent design claim.

## C. DERIVATIVE CLAIMS

Plaintiffs also argue that the trial court improperly dismissed Charles' claims for negligent infliction of emotional distress and loss of consortium. However, in order to sustain a claim for negligent infliction of emotional distress, the alleged physical injury must be "proximately caused by defendant's negligent conduct." *Daley v LaCroix*, 384 Mich 4, 12; 179 NW2d 390 (1970). Similarly, "[a] claim of loss of consortium is derivative and recovery is contingent upon the injured spouse's recovery of damages for the injury." *Berryman v K Mart Corp*, 193 Mich App 88, 94; 483 NW2d 642 (1992). Given our conclusion that the trial court did not err in dismissing plaintiffs' negligent design claim, Charles' derivative claims necessarily failed as a matter of law and summary disposition was proper under MCR 2.116(C)(8).

Affirmed. No costs awarded. MCR 7.219(A).

/s/ Deborah A. Servitto
/s/ Christopher M. Murray
/s/ Stephen L. Borrello